Ronald Patrick LOVE, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–92–00365–CR.

Court of Appeals of Texas,
El Paso.

Aug. 24, 1995.

M. Clara Hernandez, El Paso County Public Defender, El Paso, for appellant.

Jaime E. Esparza, District Attorney, El Paso, for State.

Before McCLURE, CHEW and MILLER, JJ.

## OPINION

McCLURE, Justice.

This is an appeal from a jury conviction for the offense of murder. The jury assessed punishment at life imprisonment. We affirm.

### PAROLE LAW INSTRUCTION

In Appellant's first point of error, he asserts the court erred by including the parole law instruction in the charge at the punishment stage of trial pursuant to TEX.CODE CRIM.PROC.ANN. art. 37.07, § 4(b) (Vernon Supp.1994). The instruction stated:

Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-fourth of the sentence imposed or fifteen years, whichever is less, without consideration of any good conduct time he may earn. If the defendant is sentenced to a term of less than six years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

This section does not permit the introduction of evidence on the operation of parole and good conduct time laws.

At trial, Appellant objected to this instruction of the grounds that: (1) the inclusion of the instruction violated the ex post facto provision of the Texas Constitution as the constitutional amendment which allowed the instruction did not take effect until 1991; (2) as the statute providing for the instruction did not exist in 1979, its inclusion was violative of the separation of powers clause of the Texas Constitution; and (3) the instruction violates the Due Process Clause of the United States Constitution. The court overruled these objections.

On appeal, Appellant asserts that the instruction, in this circumstance, is a violation of the ex post facto provision. He also maintains that he was harmed in that the law applicable at the time of the commission of the offense provided that an individual serve calendar time of one-third of the sentence while the instruction indicated that one-

fourth of the time would be served.[1] This last contention appears for the first time on appeal.

Regarding the first contention, Article I, § 16 of the Texas Constitution provides that "[n]o bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." *Grimes v. State,* 807 S.W.2d 582, 583 (Tex. Crim.App.1991). In order to violate Article I, § 16, a law must punish as a crime an act committed prior to the passage of the law, which was innocent when done; make more burdensome the punishment for an offense after its commission; or deprive one accused with a crime of any defense available according to the law at the time the act was committed. *Id.* In *French v. State,* 830 S.W.2d 607, 608 (Tex.Crim.App.1992), the accused committed the offense prior to the re-enactment of Article 37.07, § 4, but the trial occurred after the 1989 effective date of the re-enactment.[2] The accused complained of the inclusion of the parole law instruction as an ex post facto violation. The Court of Criminal Appeals held that the inclusion of the instruction simply informed the jury that good conduct time and parole exist. Further, it admonished the jury that it may not consider the manner in which the parole may be applied to the defendant. The court reasoned that the instruction does not punish criminally an act previously committed which was innocent when done; it does not make punishment for a crime more burdensome after its commission; and it does not deprive an accused of a defense which was available to him or her at the time the act was committed. *French,* 830 S.W.2d at 608.

Appellant urges, first, that *French* is not applicable to the instant case because the offense in *French* "appears to have occurred *after* September 1, 1987." Appellant states that the 1987 amendment contained language stating that any offense committed before the effective date was covered by the law in effect when the offense was committed; the 1987 amendment did not.[3] However, as the *French* case does not state when that offense occurred, it cannot be so distinguished on the asserted factual difference. *See French,* 830 S.W.2d at 608–09.

Next, Appellant contests the holding in *French* that the parole instruction does not violate the ex post facto provision of the Texas Constitution by not making "more burdensome the punishment for a crime after its commission." *Id.* at 608. Appellant reasons that an instruction suggesting to the jury that an individual will serve only a fraction of the sentence they assess will, of necessity, induce them to assess a longer sentence thereby making the punishment more burdensome. He maintains that this is especially true when, as in his case, the instruction given is incorrect as to how his parole eligibility would be calculated.

The holding in *French* that the issuance of the parole law instruction does not make more burdensome the punishment for an offense after its commission is predicated on the fact that the instruction merely informs the jury that good conduct time and parole exist and the instruction then admonishes the jury that it may not consider the manner in which the parole law may be applied to the accused. *French,* 830 S.W.2d at 608. This holding and its attendant reasoning are obviously controlling regarding the issue and we adhere to such holding.

Lastly, Appellant asserts that he was harmed by the erroneous instruction that he

---

1. The State concedes that the one-third rule was applicable to Appellant.

2. Article 37.07, § 4 was first enacted by the 1985 session of the Texas Legislature. Acts 1985, 69th Leg., R.S., ch. 576, § 1, 1985 Tex.Gen.Laws 2195, eff. September 1, 1985. In 1987, the article was amended to reflect that inmates were eligible for parole after serving one-fourth rather than one-third of their sentences. Acts 1987, 70th Leg., R.S., ch. 1101, § 15, 1987 Tex.Gen Laws 3765, eff. September 1, 1987. Section 4 was held uncon-

stitutional by *Rose v. State,* 752 S.W.2d 529, 535 (Tex.Crim.App.1987). Subsequently, Section 4 was re-enacted contingent upon voter approval of a constitutional amendment. Acts 1989, 71st Leg., R.S., ch. 103, § 1, 1989 Tex.Gen.Laws 442.

3. *See* Acts 1987, 70th Leg., R.S., ch. 1101, § 19(b), 1987 Tex.Gen.Laws 3768, eff. September 1, 1987; Acts 1989, 71st Leg., R.S., ch. 103, § 1, 1989 Tex.Gen.Laws 442.

would not become eligible for parole until the actual time served equaled one-fourth of the sentence imposed. Appellant contends and the State agrees that he was actually under a one-third provision.[4]

We first must determine which standard of review to utilize in analyzing the harm caused by the erroneous instruction. In *Rose v. State*, 752 S.W.2d 529, 552–53 n. 2 (Tex.Crim.App.1987) (opin. on rehearing), the Court of Criminal Appeals declared that former Article 37.07, Section 4(a) was unconstitutional. The Court further concluded that a charge which included an unconstitutional parole instruction was to be considered a "statutory" error, and the harm analysis to be applied was TEX.R.APP.P. 81(b)(2). *Rose*, 752 S.W.2d at 553–54. However, a constitutional amendment in November 1989 and the subsequent re-enactment of Article 37.07, § 4 in 1989, removed the constitutional defects identified in *Rose*. *Oakley v. State*, 830 S.W.2d 107, 110 (Tex.Crim.App.1992). Therefore, *Rose* is inapplicable to cases tried after the effective date of the constitutional amendment which occurred on November 7, 1989. *Madison v. State*, 825 S.W.2d 202, 207 (Tex.App.—Houston [1st Dist.] 1992, no pet.). In the present case, the trial occurred on September 8, 1992.

Accordingly, as constitutional error is not involved in this aspect of Appellant's assertions, the test prescribed in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984) (opin. on rehearing) applies. *See Belyeu v. State*, 791 S.W.2d 66, 75 (Tex.Crim. App.1989); *Grigsby v. State*, 833 S.W.2d 573, 576 n. 1 (Tex.App.—Dallas 1992, pet. ref'd).

As Appellant did not object to the instruction, we must decide whether the error was so egregious and created such harm that the accused has not had a fair and impartial trial—that is, did egregious harm occur? *Almanza*, 686 S.W.2d at 171; TEX.CODE CRIM. PROC.ANN. art. 36.19 (Vernon 1981). In mak-

ing this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. The courts will look to determine actual, not just theoretical, harm to the accused. *Id.* at 174.

In the present case, the court instructed the jury that:

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

■ Instructions similar to these have been regarded by the courts as curative and mitigating factors to consider when determining whether the giving of parole law instruction caused harm to an appellant. *Grigsby*, 833 S.W.2d at 576. It is presumed that the jury followed the judge's curative instruction regarding the admonishment to the jury not to consider the parole laws as applied to an accused. *Myres v. State*, 866 S.W.2d 673, 674 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd); *Rose*, 752 S.W.2d at 554. Absent indications to the contrary this presumption prevails. *Clayton v. State*, 767 S.W.2d 504, 506 (Tex.App.—Amarillo 1989, pet. ref'd). As it is not known in what manner, if any, the jury considered the one-fourth time parole instruction, it would be

4. Individuals convicted of offenses committed prior to September 1, 1987 are not eligible for parole consideration until they have accrued credit for one-third of their sentence. *Ex parte*

*Choice*, 828 S.W.2d 5, 8 (Tex.Crim.App.1992). The present offense was committed on April 18, 1979.

sheer speculation to adduce a finding of egregious harm. *Myres,* 866 S.W.2d at 674.

Point of Error No. One is overruled.

### THE "ALLEN" CHARGE

■ In Point of Error No. Two, Appellant contends that the court erred by giving an "Allen"[5] charge at the punishment stage of trial prior to jury deliberation and without any indication from the jury that they would be unable to reach a verdict.

At the punishment stage of trial, the jury was instructed in relevant part:

**Concerning manner of deliberation:**

(a) In order to return a verdict, each juror must agree thereto.

(b) Jurors have a duty to consult with one another to deliberate with a view of reaching an agreement, if it can be done without violence to individual judgment.

(c) Each juror must decide the case for themselves, but only after an impartial consideration of the evidence with their fellow jurors.

(d) In the course of deliberations, a juror should not hesitate to re-examine their own views and change their opinion if convinced it is erroneous.

(e) No juror should surrender their honest conviction as to the weight or effect of the evidence solely because of the opinion of their fellow jurors, or for the mere purpose of returning a verdict.

(f) If the jury is unable to reach a verdict, it will be necessary for the Court to declare a mistrial and discharge the Jury. The case will still be pending, and it is reasonable to assume that the case will be tried again before another jury at some future time. Any such

future jury will be empanelled in the same way this jury has been empanelled, and will likely hear the same evidence which has been presented to this jury. The questions to be determined by that jury will be the same as the questions confronting you and there is not [sic] hope that the next jury will find those questions any easier to decide than you have found them.

Appellant objected to Section (f) of the instruction on the grounds it was premature in that there was no communication from the jury indicating they were deadlocked—thereby tending to coerce the jury into a verdict. This objection was overruled.

An instruction of this nature is usually given in response to a specific request from the jury during situations in which the jury is deadlocked. *Jackson v. State,* 753 S.W.2d 706, 712 (Tex.App.—San Antonio 1988, pet. ref'd). In the present case, the instruction was given in the court's main charge—not in response to any request from the jury. Appellant maintains that the instruction was premature and coercive. However, there is extensive authority approving this instruction and holding that it is non-coercive.[6] *See Arrevalo v. State,* 489 S.W.2d 569, 571–72 (Tex.Crim.App.1973); *Willis v. State,* 761 S.W.2d 434, 437–38 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd); *Rodela v. State,* 666 S.W.2d 652, 652–53 (Tex.App.—Corpus Christi 1984, pet. ref'd); *Ray v. State,* 649 S.W.2d 142, 146–47 (Tex.App.—Fort Worth 1983, pet. ref'd). Further, while there may be some deficiency in the instruction, as long as it is not coercive, an accused must show that jury coercion or misconduct occurred in fact. *Jackson v. State,* 753 S.W.2d 706, 712 (Tex.App.—San Antonio 1988, pet. ref'd); *Davis v. State,* 709 S.W.2d 288, 291 (Tex. App.—Corpus Christi 1986, pet. ref'd), *cert. denied,* 481 U.S. 1057, 107 S.Ct. 2198, 95 L.Ed.2d 853 (1987).

**5.** *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

**6.** In this case, the other instructions preceding the section (f) instruction serve to further the non-coercive nature of the complained-of in-

struction. *See Duc Vu v. State,* 750 S.W.2d 8, 9 (Tex.App.—Texarkana 1988, pet. ref'd); *Love v. State,* 627 S.W.2d 457, 459 (Tex.App.—Houston [1st Dist.] 1981, no pet.).

While all the cited authority pertains to situations in which the instruction was given when the jury was deadlocked, we find no authority condemning the issuance of the "Allen" type instruction in the court's main charge. Logically, the non-coercive and harmless nature of the charge in the present case applies to its application to the court's main charge. Further, there is no indication in this case that the jury was actually coerced. However, we would discourage this type of application of an "Allen" type instruction as it needlessly presents the potential for coercion and its application is best suited for those situations in which the jury becomes deadlocked. Point of Error No. Two is overruled.

### THE INSANITY DEFENSE

In Points of Error Nos. Three and Four, Appellant maintains that the jury's negation of his insanity defense is clearly erroneous as it is so contrary to the great weight and preponderance of the evidence so as to be manifestly unjust and that the court erred by denying appellant's motion for directed verdict. In conducting a factual review of an affirmative defense such as insanity, the proper standard for review is, whether after considering all the evidence relevant to Appellant's affirmative defense, "the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust." *Meraz v. State*, 785 S.W.2d 146, 155 (Tex.Crim.App.1990). At trial the accused has both the burden of production of evidence and the burden of persuasion for his affirmative defense of insanity. *Id.* at 155. A brief narrative of the facts is necessary.

Louise Love, Appellant's younger sister, testified that on the morning of April 18, 1979, she dressed and left the Love residence in El Paso, Texas to attend her classes at the University of Texas at El Paso. She arrived home a little after 1 p.m. and saw Appellant's truck. He had just been released from Timberlawn Psychiatric Hospital in Dallas. Her mother and Louise's brother-in-law, Cliff

O'Gurian, were at the house. Louise left with her mother to run some errands and her mother told her that Appellant wanted her car. When they got home, the truck was gone. Louise went to look for a puppy Appellant had brought with him. Just as she found the puppy, Appellant drove up. She heard the front screen door slam and heard a popping noise. She went in the house and saw Appellant bending over a long gun. Louise ran out the back across the backyard and was then trapped by a fence. She heard the screen door slam and a second shot. As she planned her escape, Appellant came in view. As he walked toward her, she begged for her life. She begged Appellant to put the gun down. Then "he very slowly, very determined he raised the gun. I raised my hand, turned, and heard the shot, and then felt my hand hurt." Louise did not lose consciousness. Her fingers were dangling and blood was coming out of her mouth—she had been shot in the face. Another car pulled up and she heard another shot. She heard someone running and assumed Appellant was running from the police. Louise moved back into the house and saw that her pet white poodle had been shot in the head. She turned a corner and saw her mother's dead body. She looked out the window and saw O'Gurian's car. There was blood everywhere and she assumed he was dead. She stared at her mother for a long time and then laid at her feet until the police arrived.

The witness related that Appellant had molested her in her youth on a number of occasions. She described numerous other family incidents regarding aggressive violent behavior on the part of her brother. This ended in his going to the Timberlawn facility in Dallas. Louise stated that she had now come to the opinion that Appellant knew what he was doing during these incidents.

Clifford O'Gurian, Appellant's brother-in-law, stated that he had known Appellant for three and one-half years prior to this incident. He felt he was good friends with Appellant and he would take up for Appellant during arguments with his father. In the early morning of April 18, 1979, he learned

that Appellant was at the Love residence. He took his wife to work and went to their house. Mr. and Mrs. Love were home and they directed him to Appellant's location in the house. O'Gurian went to Appellant and saw that he was shaking, trembling, and his eyes were dilated. The witness stated that Appellant was high on drugs. O'Gurian visited with Appellant and succeeded in calming him. They went outside to look at his pickup and pull some weeds. Mr. Love left and Appellant had a phone conversation with his therapist. Appellant related to the witness that "[t]hey want me to go to Dallas." O'Gurian told Appellant that the two of them could get on an airplane and go to Dallas but Appellant stated he was too tired.

O'Gurian went to the restroom. When he went outside, Appellant was gone. Louise and Mrs. Love pulled up and the witness went to run an errand. When he arrived back at the house, Appellant was leaning on his pickup truck. The witness bent over into his car to fix a radio. He looked up and saw Appellant pointing a gun at him. He heard a blast and his hand and face were injured in a similar manner to Louise's injuries.

When asked if he had an opinion based on his experiences of that day whether or not Appellant knew right from wrong the witness stated:

Oh, absolutely did. No doubt. None. Absolutely knew what was right and wrong.

. . . . .

When I got there that morning, this guy was out of it. I don't know how else to tell you. He was trembling, shaking. Probably a lot like I'm doing now, but trust me, I don't touch nothing. His eyes were dilated. In that hour and a half, maybe even two hours, from the time that he drank that hot milk, the guy made sense. We talked about the Dallas Cowboys' last game—no, Dallas had just make a trade or something, and we talked about that—the man knew what he was doing, he was not out of it, he was very lucid.

In direct response to the question whether or not Appellant knew right from wrong when he shot the witness, a similar affirmative response was elicited from the witness.

Joan Elizabeth O'Gurian, another sister of Appellant, testified about various violent incidences regarding her brother when they were growing up. She testified that during these situations, she felt that Appellant knew right from wrong and that he knew exactly what he was doing.

The police officer that arrested Appellant stated that he received a communication describing a vehicle whose occupant was possibly involved in a murder on the west side of El Paso. The vehicle was spotted. When one officer approached, Appellant grabbed the shotgun but he put it down when commanded to do so. Appellant was responsive to their commands but appeared nervous and jittery. The officer stated that he felt that Appellant did not want to be there at that moment. After the arrest, Appellant did not cause the officers any difficulty.

John Michael Ferguson stated he was a neighbor of the Love family. On the date of the incident, he and his wife heard several shotgun blasts and some screaming. He investigated and saw an individual at the corner of the Love residence. There was a truck parked in the driveway. This person was calm until he saw Ferguson and then he started waving his arm and pointing towards the house and waving for the witness to come to where he was. Ferguson became alarmed and returned to his house. A white Cadillac came around the corner and the individual fired into the car. The individual then placed the shotgun in the bed of the truck. He then backed the truck out of the driveway and drove off. The witness described this activity as cool, methodical, and unhurried.

Richard Anthony Armendariz, another neighbor, heard a shotgun blast at about 2:45 in the afternoon of the eighteenth. He saw Appellant with a shotgun in his hand standing and looking around. When the individual saw Ferguson, he motioned for Ferguson to

come closer. Ferguson "stopped in his tracks" and went back. Armendariz went to call the police. While on the phone, he heard two blasts and a scream. He then saw a white Cadillac at the Love residence. Appellant was walking with a shotgun in his hand; he put the gun in the pickup and slowly drove away.

Detective Juan Guerrero was assigned to the investigation. The day after Appellant's arrest, he and another detective attempted to interview Appellant. After an hour and a half, they were unable to get any responses from Appellant. However, when asked if he knew that he killed his mother and shot his brother-in-law he stated, "I know. I need an attorney." When Guerrero stated that they would make arrangements to get an attorney, Appellant stated that he did not have any money and he needed a public defender.

Lastly, the state presented the testimony of Luiz Natalicio, a psychologist. Dr. Natalicio stated that he conducted a court-ordered psychological evaluation of Appellant on October 14, 1989. He found Appellant to be fully oriented and at ease. There were no symptoms of hallucinations, delusional behavior, or loss of thought. The witness stated that Appellant's IQ was in the superior range or, at least, well above average. Appellant's reading and arithmetic abilities were at a tenth grade level which was consistent with his level of schooling.

Dr. Natalicio testified that Appellant demonstrated personality traits that were consistent with a personality disorder. The history that the witness received indicated that Appellant was a schizophrenic paranoid type. However, he concluded that "he suffered from a dependent personality disorder with self-defeating traits. I did not see him as being psychotic or schizophrenic at all." Dr. Natalicio could not rule out malingering or the ability to fake symptoms with regard to Appellant's case.

The witness doubted that Appellant had ever suffered from schizophrenia. He testified that once a psychotic condition such as schizophrenia begins, it continues to worsen.

With true schizophrenia, the individual never returns to a truly functional state. Dr. Natalicio asserted that if Appellant had, at any time, been a true schizophrenic, there would have been some evidence of the condition at the 1989 evaluation. He saw no indication of psychosis at that evaluation.

During the defense portion of the trial, Appellant placed five psychiatrists and two psychologists on the stand. The first to testify was Jack Barnes, formerly a staff psychologist at Rusk State Hospital. Barnes was Appellant's therapist. He stated that Appellant experienced auditory hallucinations or, stated otherwise, heard voices inside of his head. He related that at the time, Appellant was classified as "manifestly dangerous."

Dr. S. Srinivasan, a psychiatrist, stated he was working in the maximum security unit at Rusk State Hospital in 1979. He examined Appellant about four months after the murder. He diagnosed Appellant as psychotic suffering from schizophrenia paranoid and drug abuse. Appellant stated to Dr. Srinivasan that a witch from the planet "Liscusetanius" was impersonating his mother and intended to invade earth and enslave the population. Appellant feared being a slave. Appellant justified his conduct to Dr. Srinivasan by stating that he had done nothing wrong in that he was "killing Lucifer because she was looking so evil." The witness related that Appellant did not come to the realization that he had killed his mother until 1981 or 1982. Dr. Srinivasan stated that he did not believe Appellant suffered from an antisocial personality disorder—a non-psychotic disorder characterized by frequent law breaking.

Dr. Len Dan Kerr, a psychiatrist, also testified for the defense. He treated Appellant in August of 1991. He diagnosed Appellant as a chronic, paranoid schizophrenic, polysubstance dependence by history. Dr. Kerr stated that Appellant related various delusions similar to those stated to Dr. Srinivasan. The witness stated that he had absolutely no idea whether or not Appellant knew right from wrong at the time of the shooting of this mother.

Dr. Franklin Schuster, also a psychiatrist, had examined Appellant before and after the offense. He diagnosed Appellant as suffering from severe chronic paranoid schizophrenia. The witness reported that "[h]e is vague about Satan being in his mother when he shot her, but some spirits, now transformed slightly into angels, are still visiting with him and affecting him."

Also called to the stand by Appellant was Dr. Robert W. Hagebak, Appellant's therapist at Timberlawn Hospital from 1977 until April of 1979—two weeks prior to the date of the offense. Appellant's diagnosis during that period was chronic paranoid schizophrenia.

Dr. George Race, a psychiatrist, treated Appellant at Timberlawn Psychiatric Hospital from October of 1976 until May of 1978. Dr. Race's records indicated that Appellant suffered from mental illness at age sixteen and had been treated with anti-psychotic drugs since that time. The witness stated that his initial diagnosis of chronic paranoid schizophrenia never changed during the entire course of Appellant's treatment.

Appellant's last medical witness was Dr. David F. Briones, also a psychiatrist. Dr. Briones first examined Appellant on June 7, 1979 by order of the court. He related that he noted a thinking disorder and severe autistic thinking. Appellant told Dr. Briones that "probably dogs are trying to take my person." Dr. Briones made the following statement in his report to the court:

Concerning the issue of insanity, it is felt that this individual was definitely suffering from a mental disease (chronic paranoid schizophrenia) at the time of the alleged crime. It is felt that this individual was incapable of conforming his conduct to the requirements of the law that he allegedly violated.

Appellant testified in his own defense. His extensive testimony covered the period from his youth to the various estrangements from his family and subsequent psychiatric treatments. Appellant stated that he was finally sent to the Timberlawn facility and he stayed there and at other locations in Dallas for an extensive period of time. His attending physician urged that he be recommitted.

Appellant bought the shotgun used in the killing in Dallas. He intended to use it for recreational shooting at a facility in Dallas. In April of 1979, Appellant was on an outpatient basis and was living in an apartment with a roommate named Bill Couples. He and Couples got into a fight and the police told the two that they should separate for a while. Appellant loaded his belongings in his pickup truck and left Dallas. On the morning of April 18, he arrived at his parents' home in El Paso.

Appellant testified that upon arrival at the house, he got a bad reception from his parents. He immediately had problems with his mother over leaving Dallas without the knowledge of his doctor. He also had difficulties with his father regarding the shotgun in his pickup. He felt that his parents wanted to send him back to Timberlawn. He did not want to go back to Timberlawn. It was obvious to Appellant that his mother did not want him at home. He told Dr. Hagebak upon his calling the house that he did not want to go back to Timberlawn.

Appellant indicated that he began to deteriorate rapidly. After a while, he began to see his mother as a gaseous form with tentacles. He described the shooting of his mother in the following manner:

I got out, and I saw the large black smoke above in the sky, large black smoke. I feared what those creatures might do to my mother, and for my evil witch of some sort, and I loaded the back of the pickup, back to the scene, and went forward. I got the rifle in. I remembered it was loaded. I entered the house. On entering the house I saw— . . . I saw pretty much a witch of some sort that looked sort of like my mother, close enough to see. I guess she was—she was not wearing the same clothes. There was nothing similar about this person that I saw, other than it resembled sort of my mother. It resembled her,

but there was nothing concrete. I mean, she was totally different. I cocked the gun at this point, raised it, pointed it directly at her, and I did not—I turned my head at the last—I guess I was out of practice, I didn't think—I remember pointing the gun directly to the head or in that area. I did not bead the rifle. It doesn't have a scope. It doesn't have ridges. It has a bead on the extended part of the barrel, like a little BB, and it lights up with a track on top, just above the trigger level on top of the barrel. I did not bead, I just simply pointed in that direction. I remember turning my head to the right, this way, and I obviously—I took a breath, because the gun kicks. I took a quick hard breath and I felt the kick. At that point, I realized that the gun had gotten off. I stood there for a moment. I really don't know—I just stood there for a moment—there was kind of a blank in my mind, and there was nothing there. There was nothing there to be seen, and everything really slowed down.

Appellant then saw his sister running towards the backyard. He was determined to save her for fear that she would be captured in an invasion or be taken alive. He reloaded the rifle using ammunition he had in the truck. He went to the backyard and a dog started to follow him. He shot the dog and reloaded. He saw Louise; he did not feel that he had to kill her. Instead, he shot at the tentacled creatures and was surprised that he shot Louise. He saw a person walking down the sidewalk on the other side of the street. Appellant wondered if he was one of the creatures. The individual quickly walked off. Appellant started to walk toward him but he changed his mind. He saw Cliff arriving in his car; he concealed the gun. Cliff kept doing something to the underside of his seat. Appellant did not intend to kill him. However, as Cliff kept doing something with the seat of his car, Appellant thought he was going for a gun and he pulled the trigger. Somehow Cliff got out of the car and went into a door. Appellant felt threatened. He reloaded the gun and con-

sidered following Cliff with the idea of finishing him off. He saw a large amount of blood leading from the car to the front door. He got in his truck and left. Appellant stated that when driving away, he drove slowly past the police station, "so nothing would happen." He was thinking of turning himself in when the police arrested him.

In rebuttal, the State utilized the testimony of Francisco J. Marquez, a psychiatrist. Dr. Marquez related that he first saw Appellant on March 24, 1992 to determine if Appellant was competent to stand trial. Based on two interviews, Dr. Marquez related in his report to the court that Appellant made the following statements:

He all of a sudden said, 'This is just to see if I'm competent or not and I think I am competent to stand trial. I'm charged with murder. I went on a shooting spree in 1979 and killed my mother, shot my sister and my brother in-law [sic]. I understand consequences of this. I had full intent to kill and I understand there is going to be a judge, attorneys, and there is going to be a jury. I know what I did and I understand the punishment.' He went on to say that the D.A. will make him look guilty but he knew he was not guilty because he was defending himself. He then said [he] was having auditory and visual hallucinations at the time he killed.... Mr. Love explained he was aware of killing his mother. He thinks he was in the influence of drugs because he was taking Stelazine and Cogentin given by his doctor in Timberland, Texas [sic]. He said he was living in an apartment in Dallas for 6 months and then drove to El Paso. He doesn't remember if he was hearing voices at the time but, he states he was having visual hallucinations of 'Insect-like creatures' and he wanted to get rid of those creatures. Reportedly these creatures were eating and killing people. He didn't think it was wrong at the time to start shooting. He just thought it was the right thing to do. He was trying to protect himself, his sister, and his mother from these creatures. He felt it was like canni-

bal dogs or insects. He felt he was not killing his mother but was killing these insects that were already inside his mother and sister. He was also trying to take Cliff (ex brother-in-law) prisioner [sic] and the gun went off. He didn't realize he had shot the gun. He didn't think he was killing his mother but thought he was killing spiders. He thought he was a hero. He discribed [sic] these 'insect-like creatures' being 5 to 6 feet tall with tentacles all over their bodies and being black in color. He said [he] had seen similar creatures on the television before but at that time he did not get scared because it was on the television and it was a science fiction program. When asked why he didn't shoot the television then he said 'it doesn't make any sense. Why should I shoot the television'. Mr. Love at this point became very angry and in a very emotional tone he said 'you fucking psychiatrists don't put ideas in my head with your fucking questions'. After a while he calmed down but continued to be suspicious. When asked if he had seen those creatures at another time, he said he had only seen those creatures in real life one time. Other than that he had seen them on the television. Then he said, 'You think that is a good defense?'

At the end of his report, Dr. Marquez stated that Appellant appeared competent to stand trial in that he seemed to have the ability to consult with his attorney and he seemed to have a rational and factual understanding of the charges against him. Dr. Marquez also stated that it was quite possible that as a consequence of his mental illness he did not know the difference between right and wrong.

The State's last rebuttal witness was Dr. Luis Laje, a psychiatrist. Dr. Laje examined Appellant on several occasions in 1991 and 1992. As a result of these examinations, he wrote two reports. Dr. Laje also read all of Appellant's medical records.

Dr. Laje agreed with Dr. Natalicio's testimony that an individual suffering from schizophrenia will always be in a deteriorating state. He examined the medical records from the Timberlawn facility and the other medical reports and determined that Appellant was not in a deteriorating state. Dr. Laje concluded that Appellant was manipulative and acted in a manner to do whatever he needed to get what he wanted. He testified that most of Appellant's doctors simply accepted whatever Appellant told them. He stated that Appellant was malingering. Laje stated that Appellant did not deteriorate; rather, his condition improved. This was evidenced by the fact that Appellant was sent from a maximum security hospital to a minimum security hospital. Dr. Laje stated that the schizophrenia diagnosis pronounced by the other doctor came about because they were copying histories "one from the other" without making an adequate diagnosis.

The witness stated that Appellant was a malingerer and suffered from an antisocial personality disorder. He ruled out schizophrenia. This diagnosis was based, in part, from interviews with Appellant's three sisters. Dr. Laje testified that the personality disorder did not rise to the level of a psychosis and the doctor opined that Appellant knew the difference between right and wrong when he shot his mother. He noted that before the shooting, Cliff O'Gurian found him to be normal. According to witnesses, he demonstrated normal behavior before the shooting and was calm during the shooting and did not show he was in any mental turmoil. After the shooting, he refused to talk to police. The doctor found it significant that Appellant asked for a lawyer thereby showing that he knew something had happened and he needed legal advice. The witness stated that the police reports indicated Appellant appeared to be in a catatonic state yet, when he was placed in a cell he began talking to the other prisoners as if nothing had happened. Dr. Laje also stated that the exhibition of lack of remorse after the shooting was consistent with his diagnosis of antisocial personality disorder.

The jury was charged that:

It is an affirmative defense to prosecution that, at the time of the conduct charged,

the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

The term "mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

As stated, the proper standard for review is whether after considering all the evidence relevant to an accused's affirmative defense of insanity, "the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust." *Bigby v. State*, 892 S.W.2d 864, 875 (Tex.Crim.App. 1994); *Meraz*, 785 S.W.2d at 155. The question on appeal is whether, "a rational trier of fact could have determined that [the accused] failed to prove the defense of insanity by a preponderance of the evidence." *Patel v. State*, 787 S.W.2d 410, 412 (Tex.Crim.App. 1990).

 The issue of insanity is not strictly medical in nature; it also invokes legal and ethical considerations. *Bigby*, 892 S.W.2d at 877. In determining the ultimate issue of sanity, only the jurors can join the nonmedical components that must be considered in deciding the ultimate issue. *Id.* at 878. To hold otherwise would cause the issue of sanity to be decided in the hospitals and not the courtrooms. *Id.* Expert witnesses, although capable of giving testimony that may aid the jury in determining the issue, do not dictate the result. *Graham v. State*, 566 S.W.2d 941, 948 (Tex.Crim.App.1978). The issue of insanity at the time of the offenses lies in the province of the jury. This is so not only as to the credibility of the witnesses and the weight of the evidence, but also as to the limits of the defense itself. *Id.* Before a jury's decision may be overturned on appeal, the fact issue must be undisputed or resolved to one end of the spectrum. Further, that fact determination must be found to lie outside the realm of discretion accorded the jury under the applicable standard. *Id.*

 Medically, an individual may be insane from a mental disease or defect yet, legally, he is not relieved of the criminal responsibility for that crime unless his mental condition reached the point where he was unable to distinguish right from wrong. *Graham*, 566 S.W.2d at 948.

In the present case, we are not persuaded that the fact issue was resolved or undisputed to one end of the spectrum. Nor is the finding beyond the realm of discretion afforded to the jury. While Appellant presented extensive medical evidence concerning his suffering from schizophrenia, the state presented medical evidence, although not of the same quantum, contradicting that testimony. Cliff O'Gurian testified that Appellant was lucid prior to the shootings and he knew what he was doing. Both sisters gave similar appraisals. The jury could have interpreted the incidents with O'Gurian and the passing pedestrian as attempts to eliminate witnesses to the shootings of those inside the house. O'Gurian also stated that Appellant was suffering from substance abuse prior to the shootings. Appellant drove slowly past the police station to avoid attracting attention and he asked for an attorney during police questioning. Appellant's statement in Dr. Marquez's report that he intended the killing could have been selectively believed by the jury as opposed to the other statements in the report. Further, the jury could have envisioned a motive in the killing and shootings in that Appellant did not desire to return to the medical facility. Accordingly, we find the jury's finding against Appellant on the insanity defense was not so against the great weight and preponderance of the evidence as to be manifestly unjust. Points of Error Nos. Three and Four are overruled.

### GRUESOME PHOTOGRAPHS

 In Points of Error Nos. Five and Six, Appellant asserts that the court erred in admitting a photograph of the deceased in that it was irrelevant and its probative value was greatly outweighed by its inflammatory and prejudicial effect. Appellant objected to the State's offer of State's Exhibit 8N on the grounds of relevance and that the prejudicial effect of the photograph outweighed its pro-

bative value. This objection was overruled. The photograph depicted the victim laying supine on the floor of her kitchen. She was clothed. There was a large wound to her head and the photo also showed a large pool of blood about her head. A chair was shown in the background. It is not possible from this record to know if the photo shown the jury was in color or black and white. The photograph was taken from a moderate distance and was not a close-up. It was the only such photo shown to the jury.

▮▮▮ It is within the discretion of the trial court to determine whether photographs serve a proper purpose in the enlightenment of the jury. *Long v. State*, 823 S.W.2d 259, 270 (Tex.Crim.App.1991). If a photograph is competent, material, and relevant to the issue on trial, it is not inadmissible solely because it is gruesome or might tend to arouse the passions of the jury unless it is solely offered to inflame the minds of the jury. *Id.* Once relevance is established, TEX.R.CRIM.EVID. 403 requires the admission of relevant evidence unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, the misleading of the jury, or by considerations of undue delay, or the needless presentation of cumulative evidence. *Long*, 823 S.W.2d at 271. A nonexclusive list of the factors to be considered in this analysis includes: the number of exhibits offered, the gruesome nature, the detail, size, whether they are in color or black and white, whether they are close up pictures and whether the body depicted is clothed or naked. *Barnes v. State*, 876 S.W.2d 316, 326 (Tex.Crim.App.1994). Although a crime scene may be gruesome, that fact alone will not necessarily render the probative value of the photographic evidence of the scene substantially outweighed by some prejudicial effect. *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex.Crim.App.1992).

In the instant case, we find that the photograph was properly admitted. The depiction in the photo corroborated a brief description of the body given by Detective Guerrero when he observed the body at the crime scene and could have served to demonstrate his theory that the victim was initially sitting when Appellant entered the kitchen. As stated, the sole photo was not cumulative, it was not a close up, and there does not appear to be any enhancement. Points of Error Nos. Five and Six are overruled.

### PROSECUTOR'S OPENING STATEMENT

▮▮▮ In Point of Error No. Seven, Appellant contends that the court erred by overruling his objection to a portion of the prosecutor's opening statement. During the State's opening statement he stated:

> The State will show that he was a person who became institutionally dependent, but at the same time he rebelled against his parents who put him there, and in a fit of rage and temper, in a fit of intentional knowledge, malice aforethought, went to the house and did the shooting spree, and then copped insanity, and all of that is today before you.

Appellant objected to his statement on the ground it disparaged his defense. The court overruled the objection.

TEX.CODE CRIM.PROC.ANN. art. 36.01(a)(3) (Vernon Supp.1995) provides that the State shall state to the jury the nature of the accusation and those facts expected to be proved by the State in support thereof. In the context of jury argument, argument directed towards the insanity defense is proper. *McBride v. State*, 706 S.W.2d 723, 728 (Tex.App.—Corpus Christi 1986, pet. ref'd). Prior to this statement, the prosecutor explained how the State was going to show that Appellant was manipulative and malingering. While the phrase "copped insanity" is in the vernacular, it is merely reflective of the general tenure of what the State was going to try to prove. Accordingly, the statement was not erroneous. Point of Error No. Seven is overruled.

### POST–ARREST SILENCE

▮▮▮ In Point of Error No. Eight, Appellant maintains that the court erred by allow-

ing the state to present evidence of Appellant's post-arrest silence. At trial, Officer Clifton Walsh testified that, upon Appellant's arrest, he took custody of Appellant and read him his Miranda rights. During the direct examination of the witness, the following exchange occurred:

STATE: Did you observe anything else?

WITNESS: Just the conduct of the Defendant.

STATE: What was his conduct?

WITNESS: Quiet. Very silent. Not responsive.

STATE: Was this during the whole period of time he was in your custody?

WITNESS: Yes, it was.

STATE: Did you observe anything else about him?

WITNESS: No, just that he was not responsive to anything.

DEFENSE: I will object to this line of questioning, your Honor, as being ambiguous to due process.

COURT: You are objecting to the last question?

DEFENSE: Yes, your Honor.

COURT: It's overruled. Sir, I will ask you to listen closely to the question and respond only to the question.

DEFENSE: Well, actually, your Honor, I am objecting to the response.

COURT: I already made my ruling. I will ask the witness not to respond if counsel stands up to make an objection. If there was a response, I will instruct the jury at this time that you are not [to] consider it for any purpose. Do you understand the question as directed to you?

WITNESS: Will you please repeat the question.

STATE: Could I ask the reporter to read back the question?

STATE: That was my question. Did you observe anything else about him?

WITNESS: I did observe that he was not responsive when I gave him the Miranda warning.

DEFENSE: Objection, your Honor, violation of due process.

COURT: Counsel, approach the bench.

COURT: At this time, the objection will be overruled. I will instruct the witness to listen closely to the question and answer only the question.

STATE: I will withdraw the question. Did you have occasion to place him in a cell?

WITNESS: No, I did not.

STATE: Was he able to obey your commands?

WITNESS: Yes, sir.

STATE: Other than being silent, did he appear to be lucid?

DEFENSE: I will object to the form of that question, your Honor, it's commenting on his—

STATE: I don't see what he's commenting on. I will withdraw the question, your Honor.

DEFENSE: I object to the prosecutor—I would ask for a ruling, your Honor, respectfully.

COURT: No question to rule on, the question is withdrawn.

DEFENSE: Could the Court please instruct the jury to disregard prosecutor's remarks?

COURT: I will instruct the jury at this time, of course, anything the attorneys say throughout the trial is not evidence. It's only the response to the questions that will be considered by you.

DEFENSE: Move for mistrial, your Honor.

COURT: Motion denied.

STATE: Lt. Walsh, did he appear to be lucid?

WITNESS: He appeared to be emotionless. I saw no emotion expression on his face at all.

STATE: Anything else you observed?

WITNESS: He was complying with our request, for example, that he remain in the car, remain seated, directions in which way to walk, which way to go.

STATE: He had a sense of presence about him?

WITNESS: It appeared so.

Appellant asserts that this testimony violated his right against commenting on his post-arrest silence. However, we note that earlier in the trial Lt. Luis Barba testified that Appellant was holding the shotgun when the officers first approached. Barba told Appellant to drop the gun or he would be shot. Appellant immediately dropped the gun and he was placed under arrest. Barba turned Appellant over to other police. At that point, Barba did not read Appellant his Miranda warnings but he was certain someone else did. During the cross-examination of Lt. Barba, Appellant elicited the following responses:

DEFENSE: Was Mr. Love pretty obedient at this time?

WITNESS: He obeyed our commands.

DEFENSE: He wasn't making any kind of gestures, was he?

WITNESS: No.

DEFENSE: He was just sitting there?

WITNESS: He obeyed our commands. I told him to keep his hands on the steering wheel where I could see them, and Aceves came up on the other side and pulled him out of the vehicle. I tried to opened [sic] the door, it was locked, the passenger side.

DEFENSE: He appeared very calm?

WITNESS: No, sir, I never said that.

. . . . .

DEFENSE: At the time that you arrested him, did you or anyone read him his Miranda rights?

WITNESS: I personally didn't. I'm sure somebody else did, it's customary.

. . . . .

DEFENSE: When you asked him about his identification, what did he tell you?

WITNESS: He was not too responsive. He was not responsive to our questions, he was responsive to our demands.

DEFENSE: So, what did you ask him?

WITNESS: His name.

DEFENSE: What did he say?

WITNESS: He was not responsive.

DEFENSE: Did you ask him where he was coming from?

WITNESS: We asked him those basic questions to make sure that we had the right person, and he was not responsive.

DEFENSE: Is it true to say that you're asking him for a lot of information and he just isn't giving you anything, is he? He's just quiet?

WITNESS: He was nonresponsive. He would just not response [sic]. I don't know what else to say, sir.

DEFENSE: Just that it was a very emotional charged happening. I mean, traffic stopped, lights are flashing, police officers are out with guns pointed at this individual, and you're asking him questions and he's just not responsive.

WITNESS: That's correct.

Later in the trial, Detective Juan Guerrero testified that he and another detective attempted to interview Appellant the day after his arrest. During this testimony, Guerrero stated without objection that Appellant would not answer his questions and they could not get much out of him.

■ When an accused causes the admission of testimony which is substantially the same as that to which he or she objected, or he or she allows it to come in from another source without objection, there can be no complaint on appeal. *Hudson v. State*, 675 S.W.2d 507, 511 (Tex.Crim.App.1984); *Juhasz v. State*, 827 S.W.2d 397, 401 (Tex. App.—Corpus Christi 1992, pet. ref'd). It is clear that Appellant elicited responses sub-

stantially similar from the witness Barba. Further, he allowed Detective Guererro to testify regarding Appellant's post-arrest silence. Appellant has waived his contention on appeal. Point of Error No. Eight is overruled.

### SPEEDY TRIAL

■ In Point of Error No. Nine, Appellant contends that the court erred in denying his motion for speedy trial. Just prior to resting his case, Appellant urged his motion to dismiss for failure to provide a speedy trial. This was the first time he had urged this motion. The motion was based on the loss of important witnesses due to the passage of time. During the hearing on this motion, Appellant's investigator stated that: (1) a Dr. Walker had died four years prior to trial; (2) an individual named Dr. Goodman was too ill to attend the trial; (3) one potential witness, a Dr. Sabater, could not be located; (4) a Dr. West died six months prior to trial; (5) a Dr. Hornisher could not be located; (6) another witness, a Dr. Moore, could not be located. Appellant offered the reports of these doctors into evidence but specifically limited their use for the record and not for the jury.

Appellant inquired of Dr. Luis Laje as to whether his diagnosis of Appellant's mental status contradicted the diagnosis found in the missing Dr. Hornisher's report. The two doctors differed regarding whether Appellant actually suffered from paranoid schizophrenia.

Appellant introduced a motion for speedy trial bearing the date of April 8, 1992, and the court took judicial notice of the motion. Upon inquiry by the court, Appellant acknowledged he had not urged a hearing for dismissal because at the time of the filing of the motion, his investigator had not attempted to obtain the individuals mentioned at the hearing. Appellant urged the court to grant the motion in that the case was being tried over thirteen years after the offense was committed and in that the lack of the missing witnesses was prejudicial. The motion was denied.

■ The issue of whether a defendant has been denied his constitutional right to a speedy trial is determined by using the balancing test enunciated in *Barker v. Wingo*, 407 U.S. 514, 531, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117 (1972). This test involves the weighing of four factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice resulting form the delay. *Id.*

■ The length of the delay is the threshold issue. It is measured from the time the defendant is formally charged or arrested. *Burgett v. State*, 865 S.W.2d 594, 597 (Tex.App.—Fort Worth 1993, pet. ref'd). The delay must be long enough to be "presumptively prejudicial." *Id.* A five year delay is sufficient to undertake speedy trial consideration. However, this delay presumption does not automatically constitute a violation of the right. *Id.*

■ Once the delay is determined to be presumptively prejudicial, the reasons for the delay should be considered. *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. The burden is upon the State to justify or explain the delay. *Green v. State*, 760 S.W.2d 50, 52 (Tex.App.—El Paso 1988, no pet.). While deliberate attempts to delay or hamper the defense will be weighed heavily against the State, delay caused by acts of the accused which are beyond the control of the prosecution should not weigh against the State. *Burgett*, 865 S.W.2d at 597. An accused may be disentitled to the speedy trial safeguard when he or she has or shares the responsibility for the delay. The accused cannot sustain a claim for speedy trial in situations where the delay is a result of evading arrest, making dilatory pleadings or motions, failing to object when a continuance is granted to the State, or his incompetence to stand trial. *Dickey v. Florida*, 398 U.S. 30, 48, 90 S.Ct. 1564, 1574, 26 L.Ed.2d 26, 38 (1970).

948

Appellant concedes that delays encountered in bringing a defendant to trial who is found incompetent do not infringe upon an accused's right to speedy trial. Both parties agree that Appellant was repeatedly found incompetent to stand trial until April 6, 1992 when Appellant and the State filed an agreed order of competency. Accordingly, we find no speedy trial violation in this instance. Point of Error No. Nine is overruled.

## HEARSAY TESTIMONY UNDERLYING EXPERT OPINION

■ In Point of Error No. Ten, Appellant argues that the court erred by allowing a state's witness to testify to inadmissible hearsay. Appellant complains specifically of the statement of Dr. Luis Laje where he detailed the questions he asked Appellant's sisters while obtaining Appellant's personal history in order to arrive at his diagnosis of antisocial personality disorder. Appellant objected on the ground of hearsay and the objection was overruled. The witness then testified that between the ages of fifteen and eighteen, Appellant "tested positive for" or exhibited traits of truancy, expulsion from school, delinquency, running away from home, persistent lying, forced intercourse, drunkenness and substance abuse, and inferior subsequent school performance.

The State maintains that the testimony was admissible under TEX.R.CRIM.EVID. 702, 703, and 705. Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Rule 705 provides:

(a) **Disclosure of Facts or Data.** The expert may testify in terms of opinion or inference and give his reasons therefore without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event disclose on direct examination, or be required to disclose on cross-examination, the underlying facts or data, subject to subparagraphs (b) through (d).

(b) **Voir Dire.** Prior to the expert giving his opinion or disclosing the underlying facts or data, a party against whom the opinion is offered shall, upon request, be permitted to conduct a voir dire examination directed to the underlying facts or data upon which the opinion is based. This examination shall be conducted out of the hearing of the jury.

(c) **Admissibility of Opinion.** If the court determines that the expert does not have a sufficient basis for his opinion, the opinion is inadmissible unless the party offering the testimony first establishes sufficient underlying facts or data.

(d) **Balancing test; Limiting Instructions.** When the underlying facts or data would be inadmissible in evidence for any purpose other than to explain or support the expert's opinion or inference, the court shall exclude the underlying facts or data if the danger that they will be used for an improper purpose outweighs their value as explanation or support for the expert's opinion. If the facts or data are disclosed before the jury, a limiting instruction by the court shall be given upon request.

In Dr. Laje's second report to the court, he stated that:

Your Honor, in conclusion, all I have written, rules out schizophrenia absolutely. But I have to provide a diagnosis. In my opinion, Mr. Love has an antisocial person-

ality disorder. However, I must avoid the pitfalls that I have criticized. Therefore, I will substantiate my diagnosis with reference to the DSM III–R (Diagnostic and Statistic Manual for Mental Disorders, from the American Psychiatric Association). I will list the conditions established for the diagnosis of Antisocial Personality Disorder, and I will mark as positive the ones that Mr. Love presented and as negative the ones he did not present. The information was given to me by Mr. Love's three sisters, Joan, Jean, and Louise.

Prior to his testimony, Appellant took Dr. Laje on voir dire to determine the bases for his opinions. He stated he needed to interview the three sisters in order to make his diagnosis because they were the sole source of such information. He testified that he needed this personal interview because in order to determine if a person has an antisocial personality, he needed to interview people who have known the individual a long time. Dr. Laje stated he went through the categories in the DSM III–R with the sisters and noted their responses.

There was prior testimony from other witnesses concerning the validity of the taking of histories to diagnose mental illness. Dr. Natalicio stated that history is a component in making a diagnosis, and the DSM III–R is an authoritative work in psychiatry and psychology in diagnosing patients. Dr. Briones testified he utilized Appellant's history extensively in making his diagnosis.

As stated in TEX.R.CRIM.EVID. 705(d), if the underlying facts or data which support the opinion would be inadmissible in evidence for any purpose other than to explain or support the expert's opinion or inference, the court must weigh the value of the facts in supporting the opinion against the danger they will be used for an improper purpose. Here, it is clear that the facts related to Dr. Laje by the three sisters weighed heavily in his diagnosis. We note also that much of what was related to the jury by Dr. Laje had come out in earlier testimony from Joan O'Gurian and Louise Love. Accordingly, we find that the court did not err in allowing the testimony before the jury. Point of Error No. Ten is overruled.

We affirm the judgment of the trial court.

MILLER, J., sitting by assignment.