# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00434-CR

**Carolyn Barnes, Appellant**

**v.**

**The State of Texas, Appellee**

FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT
NO. 10-663-K368, HONORABLE LLOYD DOUGLAS SHAVER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Carolyn Barnes guilty of aggravated assault with a deadly weapon for having threatened and fired shots toward a 68-year-old census worker, and assessed sentence at three years in prison. *See* Tex. Penal Code § 22.02. Barnes[1] contends on appeal that the district court abused its discretion by admitting photographs of the inside of her house and a recording of her call to 911 when police came to investigate, that a pretrial photo lineup was impermissibly suggestive, that there was insufficient evidence to support her conviction, that she was denied a speedy trial, that she was denied a constitutional right to participate as co-counsel in her case, that the trial judge had not taken a required oath, and that there is no record of a hearing on a

---

[1] Court-appointed counsel filed a brief on Barnes's behalf. More than seven months later, Barnes herself filed a letter asserting that she intended to file a pro se brief and making several complaints about court process. This Court's clerk sent Barnes, at her request, a copy of the clerk's record and reporter's record filed in this appeal. Barnes did not file a pro se brief.

motion to suppress that was allegedly held before the suppression hearing that appears in the record. We will affirm the judgment.

## BACKGROUND[2]

Kathleen Gittel, a sixty-eight year old United States Census worker, testified about events that led up to the underlying offense. She stated that she was assigned to count for the census persons in a neighborhood in the northern part of Leander near U.S. Highway 183 and River Run Road. She sought to ascertain whether anyone was living at addresses from which no census report had been received. While looking to confirm an address at one house, Gittel encountered a woman who pointed a gun directly at her and threatened to shoot her. As Gittel hurriedly left the property, shots were fired from behind her "at [her] back," and heard the woman say, "[Y]ou tell your supervisor I'll shoot at anybody else who he sends here," and "Hey Dale, I just shot a government employee—just ran a government employee off my—off my property."

Gittel did not elaborate as to the identity of "Dale," but later trial testimony referred to a contentious history between Barnes and Dale Rye, a prosecutor with the Williamson County Attorney's Office who had tried a case in which Barnes was defense counsel. According to Melissa Hightower, an eighteen-year law enforcement officer and Chief Investigator with the Williamson County Attorney's Office assigned to that case, Barnes would "become angry," engage in "rants or tirades," and confront Rye after the "normal course of court" when the

---

[2] The background is summarized from testimony and evidence in the record of this appeal and the appeal from Barnes's civil commitment. *See Barnes v. State*, No. 03-12-00631-CV, 2016 Tex. App. LEXIS ____ (Tex. App.—Austin July 13, 2016, no pet. h.) (mem. op.). The parties' briefing also relied on both records.

judge might have already left the bench. At least one investigator remained in the courtroom out of concern that such confrontation could escalate into physical violence. Investigator Hightower also testified that after Rye and another investigator went to Barnes's property pursuant to a court order to deliver discovery, Barnes accused the investigator of bringing a shotgun with him. At a subsequent hearing Investigator Hightower attended, Barnes asked the judge if bringing the shotgun to her property was his idea. Barnes then looked at Rye and told him that if he trespassed on her property again, "he would not be the only one with a shotgun."

Gittel testified that she did not hear any more from the woman after the statement directed to "Dale." Gittel continued down the rough trail, moving as quickly as she could because she still considered herself in trouble. Once she was on River Run and thought she was at a safe distance, she reported the offense to her supervisor, and she and her supervisor reported the offense to law enforcement. Later that day, Gittel identified Barnes from a photographic lineup as "the woman who shot at me."

When uniformed sheriff's officers arrived to investigate, Barnes called 9-1-1 reporting that people were outside her home intending to kill her. Upon Barnes's initial intake into jail, a magistrate judge sought an assessment for mental illness. *See* Tex. Code Crim. Proc. art.16.22 (authorizing magistrate to seek mental-health evaluation when there is reasonable cause to believe—based on information including defendant's behavior immediately before, during, and after arrest—that defendant has mental illness). The State later filed a similar motion for appointment of experts to examine Barnes for competency. *See id.* art. 46B.021. Barnes was examined and initially found competent to stand trial.

3

However, the court ordered another examination approximately ten months later when defense counsel noted that Barnes seemed to have had a "substantial decline in psychiatric condition." After mental-health experts issued reports diagnosing Barnes with delusional disorder (paranoid/persecutory type) and mood disorder and concluding that she was incompetent to stand trial, the court ordered Barnes's commitment to a mental-health facility for restoration to competency. *See id*. art. 46B.073. During her commitment, Barnes expressed her belief that other patients were stalking her and that hospital staff members were deliberately inciting patients to assault her. Reports to the court from mental-health experts diagnosed Barnes with psychotic disorder, mood disorder, personality disorder, and major depressive disorder. Relying on these reports, the court signed a twelve-month extension and then a twelve-month renewal of Barnes's civil commitment. *See id*. arts. 46B.102, 46B.104; Tex. Health & Safety Code §§ 574.035, 574.066. That unexpired order was effectively vacated when the court signed an order finding, based on new reports from mental-health experts, that Barnes was competent to stand trial. The case then proceeded to trial, and the jury convicted Barnes. This appeal followed that conviction.

**Admission of 911 recording and photographs**

In her first issue, Barnes contends for the first time on appeal that the district court abused its discretion by admitting her 911 recording because it was more prejudicial than probative under Texas Rule of Evidence 403. *See* Tex. R. Evid. 403 (authorizing court to exclude relevant evidence if its probative value is "substantially outweighed" by, among other things, danger of unfair prejudice). Before deciding whether a trial court erred in the admission of evidence, we must determine whether the alleged error was preserved by a proper objection and a ruling on that

objection. *See Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *see also Rodriguez v. State*, Nos. 01-13-00447-CR & 01-13-00448-CR, 2016 Tex. App. LEXIS 2507, at *31 (Tex. App.—Houston [1st Dist.] Mar. 10, 2016, no pet. h.) (holding that appellant waived objection to admission of 911 recording by making different objection on appeal than at trial). A proper objection is one that is timely and specific. *See* Tex. R. App. P. 33.1; *Martinez*, 98 S.W.3d at 193. Further, the complaint on appeal must comport with the objection at trial. *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014). At trial, Barnes's objection to the 911 recording was not that the evidence was more prejudicial than probative under Rule 403 but rather that the recording should be suppressed as the result of officers' "illegal actions." We conclude that Barnes did not preserve this appellate complaint and it is waived.

Also within her first issue, Barnes contends that the district court abused its discretion by admitting photographs showing the disarray of her house that were more prejudicial than probative under Rule 403. Rule 403 requires that a photograph have some probative value and that its probative value not be substantially outweighed by a danger of unfair prejudice. Tex. R. Evid. 403; *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009). Admissibility of photographs is within the sound discretion of the trial judge, and we will not disturb the trial court's decision unless it falls outside the zone of reasonable disagreement. *Young v. State*, 283 S.W.3d 854, 874-75 (Tex. Crim. App. 2009). Generally, a photograph is admissible if verbal testimony about the matters depicted in the photograph is also admissible. *Id*. at 875.

Here, before Barnes objected to the photographs, her son Austin Bednorz had testified without objection that the house where he and his mother lived was "kind of messy." Gittel had also testified without objection that she had seen inside the house "large barrels of trash and stuff, and

5

cardboard boxes piled up" and she thought the house was unoccupied because she "just couldn't see how anybody could be living in that house in that condition." The photographs of the disorderly interior of Barnes's house tend to show that Gittel correctly identified Barnes's property. Further, as the district court explained, the photographs were relevant to explain why the police were unable to find inside this house the weapon that was used in the assault. We conclude that the district court's decision to admit these photographs did not fall outside the zone of reasonable disagreement, and that the court did not abuse its discretion by determining that the probative value of these photographs was not substantially outweighed by a danger of unfair prejudice. We overrule this portion of Barnes's first issue.

**Pretrial photo lineup was not impermissibly suggestive**

In her second issue, Barnes contends that a pretrial photo lineup presented to Gittel was impermissibly suggestive and led to a substantial likelihood of irreparable misidentification at trial. We review de novo a trial court's ruling on how the suggestiveness of a pretrial photo array may have influenced an in-court identification. *Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009). In addressing this issue, we undertake a two-part test to determine: (1) whether the out-of-court identification procedure was impermissibly suggestive; and if it was, (2) whether that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001) (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *Kirvin v. State*, 394 S.W.3d 550, 563 (Tex. App.—Dallas 2011, no pet.). This analysis requires examination of the "totality of the circumstances" surrounding the particular case. *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). It is appellant's burden to show by clear

6

and convincing evidence that the identification has been irreparably tainted before we will reverse appellant's conviction. *Id*. at 34.

Barnes argues that she was "strongly accentuated" and "distinguished" from other individuals in the lineup because "most of the women in the lineup were Hispanic."[3] The basis for this argument is unclear because there is no identifying information in the record about anyone in the lineup, which consists of blue-background driver's license photos of women who all appear to be fair-skinned brunettes, one with lighter-brown hair, worn in a similar, below-the-shoulder-length style. At the trial-court hearing to suppress the lineup, Barnes suggested that only two of the six women pictured, not "most" of them, appeared Hispanic. Further, the record reflects that Gittel was shown the photo lineup on the same day as the assault and that she remembered Barnes as the person who shot at her: "When this happened, when—when she was holding the gun on me, time seemed to stop. And I took in every aspect of what was happening. And I really took in her features." Gittel recognized Barnes's features in her lineup photo: "It was the whole confirmation of her—of her face, her hair, her eyes, her nose and mouth, her cheekbones, her jaw line, and how it all went together. Looked a little younger, but it was definitely her."

We conclude that the evidence in this record does not support Barnes's contention that the lineup was impermissibly suggestive. Having reached that conclusion, we need not address whether the lineup gave rise to a substantial likelihood of irreparable misidentification. *See Conner*, 67 S.W.3d at 200; *Kirvin*, 394 S.W.3d at 563. We overrule Barnes's second issue.

---

[3] Barnes states that an officer made a comment to Gittel about Barnes's photo *after* Gittel had already identified Barnes from the lineup as "the woman who shot at me." Barnes does not explain how any statement made after Gittel had already picked Barnes from the lineup could have influenced Gittel's selection of Barnes's photo beforehand.

**Sufficient evidence supported Barnes's conviction for aggravated assault**

In her third issue, Barnes contends that there was insufficient evidence supporting her conviction for aggravated assault. She argues that Gittel was unable to view "the defendant" after the shots were fired because Gittel was facing in another direction.

When reviewing the sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict to decide whether any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Circumstantial evidence is as probative as direct evidence in establishing an actor's guilt, and an actor's guilt can be established with circumstantial evidence alone. *Temple*, 390 S.W.3d at 359. In circumstantial-evidence cases, every fact need not point directly and independently to the guilt of the appellant; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Id*. The jury is the sole judge of the credibility and weight to be attached to the testimony of witnesses. *Jackson*, 443 U.S. at 319. When the record supports conflicting inferences, we presume the jury resolved the conflicts in favor of the verdict and defer to that determination. *Temple*, 390 S.W.3d at 360 (citing *Jackson*, 443 U.S. at 326).

The offense of assault, as defined in section 22.01(a)(2) of the Texas Penal Code, is committed when a person intentionally or knowingly threatens another with imminent bodily injury. Tex. Penal Code § 22.01. Aggravated assault is an offense consisting of the commission of an assault as defined in section 22.01, along with the persons's use or exhibition of a deadly weapon during the commission of the assault. *Id*. § 22.02(a)(2).

8

On the day of the offense, Gittel recalled that she wore a badge identifying her as a census worker, carried a clipboard in her hand, and had a large bag over her shoulder that said "United States Census 2010." Gittel testified that she sought to ascertain whether anyone was living at addresses from which no census report had been received. She was provided addresses and a map with spots for the addresses. Three of those addresses were behind a locked gate with a keypad. Gittel stated that she used the keypad to call the phone number provided at the gate for those desiring access, but no one answered. Believing that her work gave her permission to pass the gate, she testified that she parked her car, walked along a path around the gate, and began looking for the addresses, including what we now know to be Barnes's residence.[4]

Gittel testified that a man in a truck stopped to ask if she needed a ride. After she accepted, she learned that he resided at one of the three addresses she was assigned to visit, and she obtained census information from him. He dropped her off along Indian Trail, where Gittel saw men working at another house that she was assigned to visit. She knocked at the door of that house and identified herself as a census worker, but the workmen told her that nobody was home.

From there, Gittel proceeded to the last house she was assigned to visit. The road toward that house was heavily wooded on both sides, climbed steeply, and parts of it contained deep

---

[4] Gittel testified that there was some confusion about the address listed in her census materials ("33 Indian Trail") as the last home she was to enumerate. She explained that one of the first questions a census worker asks is whether the person's address is correct, and that here, she had "the right house, wrong address." Gittel testified that she gave law enforcement officers a description of her walk, landmarks she had seen as she approached the last house she was to enumerate, and a description of "the woman who shot at [her]." Investigating officers were able to speak to neighbors who lived at the few other homes along Indian Trail and determined that those people and locations did not match the physical description of the property and of the suspect that Gittel had provided. But Gittel's information was consistent with what officers saw at Barnes's address, 419 Indian Trail.

9

ruts and big roots making it difficult to walk. The path eventually led her to the side of a house with a doorway. Gittel knocked at the door but got no answer. While standing there, she looked in the windows and saw large barrels of trash and cardboard boxes piled up inside the house.[5] She did not expect that anyone would be living in a house in that condition and thought all she had to do was verify the address of the house and leave. Hoping to confirm the address from the front of the house, Gittel began walking in that direction and looking for a number on it. Much of the front of the house was blocked by trees. Gittel could see the front porch, which had barrels on it and was full of trash, but she did not see any address.

She was about to leave when she heard a gunshot and smelled gunpowder. She called out as loudly as she could, "Please don't shoot me, I'm just a census worker." After getting no response, Gittel "hollered it out again." She then heard a woman's voice behind her say, in a "very threatening" and "angry" tone, "Get off my property or I'm going to shoot you." When Gittel turned around, she saw a woman pointing a gun directly at her. The woman was in a stance that Gittel described as "the classic I'm-going-to-shoot- you position": feet under hips, arms straightened out, elbows straight, and finger on the trigger, ready to shoot. Gittel said that she memorized the face of the "enraged" woman she saw, who had "longish" black hair tied back and "[h]er face was slowly suffusing with blood. She looked a little off, in the way that people do when they've lost it." Gittel

---

[5] Photographs of the interior of Barnes's home corroborate this testimony and tend to confirm that Gittel correctly identified Barnes's property. Barnes points to possible inconsistencies in Gittel's testimony as to the existence of certain items on the property—i.e., a clothesline, railroad tracks, the number of cars—that differed from some of the State's photographs of Barnes's house. To the extent there was any inconsistent testimony, it would not render the evidence insufficient; it would merely create a fact issue for the jury, which they are presumed to have resolved in favor of their verdict. *Shah v. State*, 414 S.W.3d 808, 814 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd).

testified: "It was clear to me that she was a danger to me. And I think I tried once more. I said I'm just a census worker." The woman told her, "[I]f you don't get off my property, this is your last day on earth." With some misgivings about turning her back on the woman, Gittel began walking away.

Gittel testified that she had not walked far down the trail when the woman shot "at her back." Gittel thought, "I'm going to die here." She said to the woman, "I'm walking as fast as I can, I'm 68 years old." Gittel also testified that she was unable to run because she had a total knee replacement nine months before. As she walked down the trail, Gittel heard four more shots fired.[6] She also heard the same woman's voice yell,"[Y]ou tell your supervisor I'll shoot at anybody else who he sends here," and after that, sounding a bit more distant, "Hey Dale, I just shot a government employee—just ran a government employee off my—off my property." Later that same day, Gittel identified Barnes from a photo lineup as "the woman who shot at me." At trial, Gittel again positively identified Barnes as "the woman who shot at me."

Viewing the evidence in this record in the light most favorable to the jury's verdict, and considering the combined and cumulative force of all the incriminating circumstances, we conclude that a rational jury could have found beyond a reasonable doubt that Barnes intentionally or knowingly threatened Gittel with imminent bodily injury while using or exhibiting a deadly weapon, i.e., a gun. Gittel saw the woman who pointed a gun directly at her. She testified that she memorized the woman's face. She heard the woman's voice as she explicitly threatened

---

[6] Gittel's testimony was corroborated by that of her supervisor, Williamson County area crew leader Harold Poppa, who testified that Gittel called him in a very upset, agitated, and "stressed out" state on the day of the offense and reported that "she'd been shot at five times." Poppa stated that Gittel was working the area that he had assigned to her when this occurred.

to shoot Gittel. Gittel then heard shots fired from behind her as she left the property, and the woman's voice threatening to shoot at "anybody else" that the census sent there. Later, the same woman's voice took credit for having "shot a government employee" or run a government employee off of the property.

The direct and circumstantial evidence in this record, combined with Gittel's photo lineup identification and in-court identification of Barnes as "the woman who shot at [her]," renders the evidence in this record sufficient to support Barnes's conviction for aggravated assault. *See Ford v. State*, 509 S.W.2d 317, 318 (Tex. Crim. App. 1974) (holding positive identification of appellant was sufficient to support his conviction despite alibi testimony); *see also Fletcher v. State*, No. 01-96-00115-CR, 1997 Tex. App. LEXIS 1889, at *6-8 (Tex. App.—Houston [1st Dist.] Apr. 10, 1997, pet. ref'd) (mem. op., not designated for publication) (holding that although victim was unable to identify his shooter at trial, victim's identification of appellant from photo lineup before trial and circumstantial evidence were sufficient to support appellant's conviction). We overrule this issue.

**Barnes was not deprived of right to speedy trial**

In her fourth issue, Barnes contends that because the trial court erroneously found her incompetent to stand trial, she was necessarily denied her right to a speedy trial. Courts must analyze deprivation of speedy trial claims on an ad-hoc basis by applying the fact-specific balancing test set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972). *Henson v. State*, 407 S.W.3d 764, 767 (Tex. Crim. App. 2013). This test has four factors: the length of the delay, the reason for the delay,

the defendant's assertion of his right, and the prejudice inflicted by the delay. *Henson*, 407 S.W.3d at 767 (citing *Barker*, 407 U.S. at 530).

No argument applying the *Barker* factors is set forth in Barnes's brief to support her speedy-trial issue. Thus, this issue is inadequately briefed. *See* Tex. R. App. P. 38.1(h); *see also Brewer v. State*, No. 05-08-01653-CR, 2011 Tex. App. LEXIS 2327 at *22 (Tex. App.—Dallas Mar. 31, 2011, no pet.) (mem. op., not designated for publication) (concluding that appellant's failure to include citations to record or authority supporting his claimed deprivation of right to speedy trial waived review of that issue); *Barnes v. State*, No. 05-02-00523-CR, 2003 Tex. App. LEXIS 2201, at *18 (Tex. App.—Dallas Mar. 13, 2003, pet. ref'd) (mem. op., not designated for publication) (concluding that appellant failed to show that his conviction should have been reversed on speedy trial issue because his brief merely listed four factors set forth in *Barker* but presented no argument about how those factors applied to his case).

Further, this record does not support Barnes's speedy-trial issue. A speedy trial violation may exist when the delay was exclusively for the convenience of the State, but "[a] defendant may be disentitled to the speedy-trial safeguard in the case of a delay for which he has, or shares, responsibility." *Dickey v. Florida*, 398 U.S. 30, 38 (1970); *id*. at 48 (Harlan, J., concurring); *Love v. State*, 909 S.W.2d 930, 947 (Tex. App.—El Paso 1995, pet. ref'd). Thus, an accused cannot sustain a speedy-trial claim when delay results from, among other things, making dilatory pleadings or motions or from delay occasioned by his incompetence to stand trial. *Dickey*, 398 U.S. at 48; *Hull v. State*, 699 S.W.2d 220, 222 (Tex. Crim. App. 1985); *Love*, 909 S.W.2d at 947; *see Conlan v. United States*, No. A-15-CV-603 LY, 2015 U.S. Dist. LEXIS 163935, at *12-13 (W.D. Tex. Dec. 7, 2015) (rejecting appellant's speedy trial claim and concluding that delay was attributable to

"excusable delays" such as determination of appellant's competency and his numerous motions and appeals).  Here, the record reflects that Barnes had or shared responsibility for trial delays including the determination of her competency to stand trial, awaiting her restoration to competency, her filing of numerous voluminous motions (and motions for leave to file future motions), her removal of this case to federal court, and her multiple changes of defense counsel.  Barnes was ultimately found competent to stand trial on January 11, 2013, and tried five months later.

**Barnes was not deprived of a constitutional right to hybrid representation**

In her fifth issue, Barnes argues that she was "denied the right of hybrid representation," i.e., that she was entitled to proceed represented by counsel and herself, and that the trial court deprived her of that constitutional right.  However, it is well established that no such right exists. *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984) (noting trial judge was not required to allow hybrid representation); *Landers v. State*, 550 S.W.2d 272, 280 (Tex. Crim. App. 1977) (op. on reh'g) ("There is no constitutional right in Texas to hybrid representation partially pro se and partially by counsel.").  We overrule this issue.

**Barnes did not overcome presumption to show that trial judge lacked oath**

In the first part of her sixth issue, Barnes complains of an alleged absence of a sworn oath by Judge Doug Shaver, the retired visiting judge who presided over her trial.  The presumption of the regularity of trial court judgments and proceedings applies to appellate challenges of visiting trial court judges for alleged failures to take their constitutionally required oaths. *Murphy v. State*, 95 S.W.3d 317, 320 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd).  An appellant who makes such a challenge must make a prima facie showing that the trial judge did not take the required oaths

14

before the issue will be considered on the merits. *Id*. Lack of filing of any required oath is not proof, in itself, of the failure of a judge to take the constitutionally required oaths. *Id*. at 320 & n.3.

Here, Barnes failed to meet her burden to overcome the presumption of regularity. The evidence Barnes provided on this issue was:

- the testimony of her paralegal, who said she sent an open records request to Williamson County for the appointment and oath of office of Judge Shaver but produced nothing showing the contents of any document she supposedly received from them; *see* Tex. R. Evid. 1002, and

- a letter from the Texas Secretary of State's Office as to Judge Shaver's filings that informed Barnes whom she could contact to request a copy of the oaths of office and statements of officer on file for Judge Shaver.

This is no evidence that Judge Shaver failed to take a required oath. *See id*. We overrule this portion of Barnes's sixth issue.

**Barnes waived complaint about absence of record**

Also within her sixth issue, Barnes states that there is an indication[7] of a suppression hearing held on December 28, 2012, before the suppression hearing that is in the record, and she complains that there is no transcript for it. However, the Texas Court of Criminal Appeals has held that a defendant must object to a court reporter's failure to record a portion of the trial proceedings to preserve error. *See Valle v. State*, 109 S.W.3d 500, 508-09 (Tex. Crim. App. 2003). And to be entitled to a new trial based on a lost or destroyed reporter's record, an appellant must demonstrate that the omitted portions are necessary to the appeal's resolution. *See* Tex. R. App. P. 34.6(f). The

---

[7] Barnes does not cite to any portion of the voluminous record containing this indication.

15

record contains no indication that Barnes objected to the absence of a record for a December 28, 2012 hearing on a motion to suppress, nor has she demonstrated that any portion of such omitted record was necessary to the resolution of this appeal. Accordingly, she has waived this portion of her sixth issue.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Pemberton and Bourland

Affirmed

Filed: July 13, 2016

Do Not Publish

16