# NO. 12-19-00268-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *CEDRIC DEWAYNE THOMPSON,*<br>*APPELLANT* | § | *APPEAL FROM THE 2ND* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *CHEROKEE COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Cedric DeWayne Thompson appeals his conviction for murder. He presents four issues on appeal. We affirm.

### BACKGROUND

Appellant was arrested and charged by indictment with the murder of his wife, Kayla Thompson, in April 2014. In July 2016, Appellant was found incompetent to stand trial. Appellant's competency was restored in September 2017.

In April 2018, Appellant filed a motion to dismiss the indictment as a violation of his right to a speedy trial. The trial court held a hearing on the motion and learned that the State was awaiting DNA results that were submitted for testing approximately four years after Appellant's arrest. The trial court denied the motion and entered findings of fact and conclusions of law.

Appellant later pleaded guilty and requested the trial court assess punishment. However, Appellant withdrew his guilty plea in June 2019, and the matter proceeded to a jury trial. The jury found Appellant "guilty" and sentenced him to life in prison. This appeal followed.

In his first and second issues, Appellant challenges the legal and factual sufficiency of the evidence to support the jury's punishment finding that he did not kill Kayla under the immediate influence of sudden passion.

## Applicable Law and Standard of Review

A person commits murder by intentionally or knowingly causing the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2019). Typically, murder is a first-degree felony. *Id.* § 19.02(c). However, during the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. *Id.* § 19.02(d). If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree. *Id.*; *see Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013). "Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.02(a)(2); *see also McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005) (stating that a defendant raising sudden passion to mitigate a murder conviction must prove that there was an adequate provocation, that a "passion or an emotion such as fear, terror, anger, rage, or resentment existed[;] that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide"). An "adequate cause" is one that would "commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." TEX. PENAL CODE ANN. § 19.02(a)(1). Neither ordinary anger nor fear alone raises an issue of sudden passion arising from adequate cause. *Moncivais v. State*, 425 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

"Although the issue of sudden passion is a punishment issue, it is analogous to an affirmative defense because the defendant has the burden of proof by a preponderance of the evidence." *Gaona v. State*, 498 S.W.3d 706, 710 (Tex. App.—Dallas 2016, pet. ref'd); *see also Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). For this reason, a negative finding on sudden passion is subject to legal and factual sufficiency review. *See Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015) ("Affirmative defenses may be evaluated for

legal and factual sufficiency, even after this Court handed down its opinion in ***Brooks v. State***, 323 S.W.3d 893 (Tex. Crim. App. 2010), which abolished factual-sufficiency review as it applies to criminal convictions."); *see also **Smith v. State***, 355 S.W.3d 138, 147–48 (Tex. App.— Houston [1st Dist.] 2011, pet. ref'd) (addressing legal sufficiency of finding on sudden passion issue); ***Gillam v. State***, No. 05-11-01334-CR, 2013 WL 1628386, at *15–16 (Tex. App.—Dallas Apr. 16, 2013, pet. ref'd) (op., not designated for publication) (addressing legal and factual sufficiency of finding on sudden passion).

When an appellant asserts that the evidence is legally insufficient to support a negative finding on sudden passion, we first examine the record for a scintilla of evidence to support the jury's negative finding on sudden passion and disregard all evidence to the contrary unless a reasonable factfinder could not. ***Gaona***, 498 S.W.3d at 711 (citing ***Smith***, 355 S.W.3d at 147-48). If we find no evidence to support the finding, we examine the entire record to determine whether it establishes the contrary proposition as a matter of law. ***Id***. In reviewing the record, we defer to the factfinder's determination of the credibility of the witnesses and the weight to give the evidence. ***Id***.

In reviewing the factual sufficiency of a finding rejecting an affirmative defense, we examine all of the evidence in a neutral light. ***Smith***, 355 S.W.3d at 148; ***Matlock***, 392 S.W.3d at 671. A finding rejecting an appellant's affirmative defense cannot be overturned unless, after setting out the relevant evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. ***Velasquez v. State***, No. 05-17-01214-CR, 2018 WL 6065257, at *4 (Tex. App.—Dallas Nov. 20, 2018, no pet.) (mem. op., not designated for publication) (citing ***Matlock***, 392 S.W.3d at 671-72).

## Analysis

Appellant asserts that there is no evidence to support the jury's negative finding on sudden passion. He urges that the State relied on a single witness, Kyeleigh Kincade, to disprove sudden passion. Appellant claims that the evidence shows that he was upset about Kayla's affair and that Kincade's testimony does not disprove his defense.

Appellant concedes that the evidence at trial undisputedly demonstrated that he stabbed and killed his wife. The evidence showed that Kayla was stabbed eight times. The autopsy revealed stab wounds to the neck, chest, and shoulder area and four defensive stab wounds to the

arm area. In addition to the stab wounds, Kayla sustained crush injuries from being struck by Appellant's vehicle. However, he urges that his behavior demonstrates that he killed her under the influence of sudden passion.

Appellant testified during the guilt/innocence portion of trial. According to Appellant, he and Kayla argued the evening of April 19th into the morning of April 20th. The argument concerned Kayla's affair with Benjamin Finley. Appellant testified that Kayla was alive in the home when he left the house. After leaving, Appellant attempted suicide twice: first by taking pills and second by jumping from a moving vehicle. Kayla was found the morning of April 20th by her mother, Judith Wood. Appellant was arrested later that day.

Appellant's recorded interview was played for the jury as well. During the interview with Investigator Randy Hatch of the Cherokee County Sheriff's Office, Appellant was asked repeatedly if he was mad or upset. Appellant repeatedly denied being angry or upset. One time, Appellant stated that he was mad, just like any other man would be mad. Appellant also denied killing Kayla.

Text messages from Kayla were admitted into evidence. Appellant sent her a text message on April 13, 2014, asking that the couple stay together and not break up. On April 14, Kayla sent Finley a text message telling him that she asked Appellant to move out and that it was not going well. The text messages show that Appellant continued to text Kayla seeking to reconcile their relationship and professing his love for her. During the same timeframe, Kayla sent messages to Finley arranging a time to meet. Kayla also sent Finley text messages complaining about Appellant's reluctance to leave.

Kincade, Kayla's daughter, testified that she awoke during the night of April 19th to arguing and yelling between her mother and Appellant. Kincade testified that the following occurred after she woke up:

> Q. Did you hear your mom complain about any -- anything?
> A. Yes.
> Q. What did she say?
> A. She said, you hit me in the head, you're going to go to jail. I think you left a bruise.
> Q. What did [Appellant] say?
> A. He said there's no bruise.
> Q. Did he -- did she say anything about bleeding?
> A. She said, I think I'm bleeding. It might have just left a bruise.
> Q. Did any time pass after that?
> A. Yes.
> Q. How long?

4

A. Maybe a few minutes.
Q. Did you -- could you hear talking?
A. Yes. But I couldn't really understand because the door was shut, but I could really hear the yelling.
Q. You could hear the yelling? And what were they yelling?
A. Talking about the bruise.
Q. Okay. Did you open the door and walk in there when they were talking about the bruise?
A. Yes. Like a few minutes after they were talking about the bruise, I walked in, and...
Q. And what did you say or what did people say to you?
A. I told her I was, like, is everything okay?
Q. What did she say?
A. She told me, yes, it's okay. Just go back to sleep.
Q. Did you go back to sleep?
A. I kind of dozed off, but I wouldn't say completely.
Q. Okay. Did you wake up at any other time later that night?
A. Yes.
Q. What happened when you woke up?
A. You just could hear, like, loud noises and, like, yelling, and she started screaming Kyeleigh.
Q. Did she come into your room at that point?
A. Yes. She came into my room and she said, Kyeleigh, call your Nanny.
Q. Who's Nanny?
A. My other grandmother, which is her mom.
Q. And what did you do in response to what she was saying?
A. I grabbed my phone and started typing in my password into my phone so I could call Nanny.
Q. Okay. Did your mom seem afraid or excited?
A. She seemed like she was in need of help.
Q. Were you able to call Nanny?
A. No.
Q. Why not?
A. Because while I was typing in my password, [Appellant] came and took my phone from me.

Kincade further testified that, while her mother was screaming and crying, Appellant was "calm about the whole situation." After Appellant and her mother left the room, Kincade testified that "after a few minutes of arguing," she heard "a thud" that she believed to be her mother hitting the ground. Kincade further testified,

Q. Did you hear her scream anything at that point?
A. Yes. She was just crying and saying Kyeleigh, and saying that hurt.
Q. Did you hear any appliances or drawers or anything like that?
A. After the loud thud, you could hear, like -- we didn't have a very good house. It was kind of old. And when you opened the kitchen drawer, all you could hear was the silverware.
Q. Did you hear the silverware shake?
A. Yes, sir.
Q. Okay. So it was kind of hard to open the drawer and you had to kind of shake it open? You heard that?
A. Yes, sir.
Q. Did you hear your mom say anything after that sound?
A. She kept yelling, Kyeleigh. That's all I remember.
Q. What did you do in response to her calling your name?
A. I got out of my room and I walked in there.

. . .
Q. Okay. And did you notice anything about her?
A. Well, she was just sitting there and crying. I wasn't – couldn't see for a long time because he, [Appellant], slammed the door in my face.
Q. Did you see any blood?
A. At that point, no. All I could see was her laying on the ground and him like standing over her.
Q. Was she -- did she say anything to you when you came?
A. She was crying really hard, and saying, Kyeleigh, you shouldn't have to see this. And then the door was slammed in my face. And she just told me that she loved me.
Q. When did you see blood?
A. You could hear, like, steps, people running out of the house. And so after the car took off, while there was no one in the house, I got up and I walked in, and I seen a big puddle of blood in the middle of the hallway where she was laying.

Appellant urges that Kincade's testimony demonstrates that there was "little or no time to cool off after learning about an affair and losing one's spouse, children, and home in one night." He further argues that the number and manner of stabbings, along with the manner in which Kayla was hit with the vehicle, and the evening's argument indicate sudden passion.

However, the record also contains evidence negating Appellant's sudden passion argument. Appellant denied sudden passion in his recorded interview. At trial, Appellant denied killing Kayla at all. The evidence further showed that Appellant learned of Kayla's affair days before the altercation and her death. And Kincade's testimony supports a conclusion that the argument on the night in question occurred over an extended period of time and that Appellant was calm and collected. As sole judge of the weight and credibility of the witness testimony, the jury was entitled to credit this testimony and, in doing so, could reasonably conclude that Appellant did not act under the immediate influence of sudden passion when he murdered Kayla. Accordingly, after weighing all of the evidence, we conclude that the evidence is legally and factually sufficient to support the jury's negative finding on the issue of sudden passion. *See Beltran v. State*, No. 05-19-00017-CR, 2020 WL 4047964, at *5 (Tex. App.—Dallas July 20, 2020, pet. ref'd) (mem. op., not designated for publication); *Matlock*, 392 S.W.3d at 669-70. We overrule Appellant's first and second issues.

## SPEEDY TRIAL

In his third issue, Appellant contends the trial court improperly denied his motion to dismiss based on the violation of his right to a speedy trial.

The essential ingredient of the Sixth Amendment's speedy trial guarantee is "orderly expedition and not mere speed." ***U.S. v. Marion***, 404 U.S. 307, 313, 92 S. Ct. 455, 459, 30 L. Ed. 2d 468 (1971) (Sixth Amendment right to speedy trial would appear to guarantee criminal defendant that government will move with dispatch that is appropriate to assure him early and proper disposition of charges against him). Since 1972, United States Supreme Court precedent has required courts to analyze federal constitutional speedy trial claims "on an ad hoc basis" by weighing and then balancing four factors: (1) length of the delay; (2) reason for the delay; (3) assertion of the right; and (4) prejudice to the accused. ***Barker v. Wingo***, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192, 33 L. Ed. 2d 101 (1972). This balancing test requires weighing case by case "the conduct of both the prosecution and the defendant." *Id*. No single factor is a "necessary or sufficient condition to the finding" of a speedy trial violation. *Id.*, 407 U.S. at 533, 92 S. Ct. at 2193; ***State v. Wei***, 447 S.W.3d 549, 553 (Tex. App.–Houston [14th Dist.] 2014, pet. ref'd). The related factors must be considered together with such other circumstances as may be relevant. *See **Wei***, 447 S.W.3d at 553.

In reviewing the trial court's decision on Appellant's speedy trial claim, we apply a bifurcated standard of review. *See **State v. Munoz***, 991 S.W.2d 818, 821 (Tex. Crim. App. 1999). We review factual issues for abuse of discretion and review legal issues de novo. *Id*. Because the trial court ruled against Appellant on his motion to dismiss, we must presume the trial court resolved any disputed fact issues in the State's favor, and we are required to defer to these implied findings of fact that the record supports. *See **id***.

In this case, we conclude that the approximately five-year delay between the time of the formal charge against Appellant and the time his trial commenced meets the first factor and triggers analysis under the remaining ***Barker*** factors. *See, e.g.*, *id*. at 822 (delay of seventeen months between time of the appellant's arrest and the date of speedy trial hearing).

**Reason for Delay**

Under ***Barker***, "different weights should be assigned to different reasons" for the delay. ***Barker***, 407 U.S. at 531, 92 S. Ct. at 2192. A "deliberate attempt to delay the trial" should be weighed heavily against the government. *Id*. A "more neutral reason[,] such as negligence or overcrowded courts[,] should be weighed [against the government] less heavily." *Id*. A valid reason for the delay should not be weighed against the government at all. *Id*. (valid reason for the delay "should serve to justify appropriate delay"). And delay which is attributable in whole or in

part to the defendant may even constitute a waiver of a speedy trial claim.  *Id.*, 407 U.S. at 528–30, 92 S. Ct. at 2191–92 (delay attributable to defendant constitutes waiver of speedy trial claim); *see also **Dickey v. Florida***, 398 U.S. 30, 48, 90 S. Ct. 1564, 1574, 26 L. Ed. 2d 26 (1970) (Brennan, J., concurring) (defendant may be "disentitled to the speedy trial safeguard in the case of a delay for which he has, or shares, responsibility").

The burden of excusing the delay rests with the state, and in light of a silent record or one containing reasons insufficient to excuse the delay, we must presume that no valid reason for the delay existed.  *See **Turner v. State***, 545 S.W.2d 133, 137-38 (Tex. Crim. App. 1976).  But absent evidence of intent, we will not weigh the factor so heavily as we would were there evidence of intentional conduct on the state's part.  *See **Barker***, 407 U.S. at 531, 92 S. Ct. at 2192.

The record in this case reflects that Appellant was arrested on April 20, 2014, indicted on June 23, 2014, and arraigned on July 7, 2014.  He was in continuous state custody until his trial and sentencing on July 24, 2019.

Throughout 2014 and 2015, Appellant's case was passed five times.  Of these resets, four are attributable to Appellant, and one is attributable to the court.  These delays weigh against Appellant.  And in February 2016, Appellant requested the appointment of an expert for a competency assessment.  Following a bench trial in July 2016, Appellant was found incompetent to stand trial.  In September 2017, Appellant's competency was restored and a bench warrant was issued.  We do not weigh this delay against either the State or Appellant.

Appellant hired new counsel in January 2018.  At a January 2 pretrial hearing, the State announced that it was awaiting DNA results, and the case was reset.  The State concedes that it was negligent in submitting the DNA samples to the Texas Department of Public Safety for analysis.  However, upon receipt of the motion to dismiss, the State ensured a quick trial by paying for private testing out of its budget.  This reset weighs against the State, but not heavily.

On April 10, 2018, Appellant filed his motion to dismiss.  The hearing was held on May 10, and the trial court denied the motion.

On June 4, 2018, both parties announced "not ready," a delay we do not weigh against either party.  Appellant filed a motion for continuance on October 2, 2018, which was granted and the case was reset for April 15, 2019.  This reset weighs against Appellant.

In April 2019, Appellant pleaded guilty and requested the trial court assess punishment.  The trial court ordered a pre-sentence investigation conducted.  On June 25, 2019, Appellant

withdrew his guilty plea and the case was reset for July 24, 2019. This reset weighs against Appellant.

Ultimately, Appellant's case was tried on July 24, 2019.

## Assertion of Federal Constitutional Right to Speedy Trial

Under ***Barker***, a defendant is responsible for asserting or demanding his right to a speedy trial. *See **Barker***, 407 U.S. at 528–29, 92 S. Ct. at 2191. Although a defendant's failure to assert his speedy trial right does not amount to a waiver of that right, "failure to assert the right ... make[s] it difficult for a defendant to prove he was denied a speedy trial." ***Dragoo v. State***, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003). This is because a defendant's lack of a timely demand for a speedy trial indicates strongly that he did not really want a speedy trial and that he was not prejudiced by a lack thereof. *See **id***. Furthermore, the longer the delay, the more likely it becomes that a defendant would take some action to obtain a speedy trial. *See **id***. Thus, inaction weighs more heavily against a violation the longer the delay becomes. ***Id***.

"Filing for a dismissal instead of a speedy trial will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one." ***Cantu v. State***, 253 S.W.3d 273, 283 (Tex. Crim. App. 2008). "If a defendant fails to first seek a speedy trial before seeking dismissal of the charges, he should provide cogent reasons for this failure." ***Id***. "Repeated requests for a speedy trial weigh heavily in favor of the defendant, while the failure to make such requests supports an inference that the defendant does not really want a trial, he wants only a dismissal." ***Id***.

"This is not to say, however, that asking only for dismissal will result in a 'waiver,' while seeking a speedy trial and, in the alternative, a dismissal, would preserve the claim." ***Phillips v. State***, 650 S.W.2d 396, 401 (Tex. Crim. App. [Panel Op.] 1983). "In some cases, defense counsel may legitimately feel that a long delay has caused a client so much prejudice that dismissal is warranted, even if the State is belatedly ready to move promptly." ***Id***. "Each case must turn on its own facts, and the particular relief a defendant seeks is but one fact to consider." ***Id***. We also consider whether there is anything "to suggest that appellant deliberately failed to move for a speedy trial because of tactical reasons." *See **id***. (citing ***Barker***, 407 U.S. at 534–36, 92 S. Ct. at 2182); *accord **Cantu***, 253 S.W.3d at 283.

The State argues Appellant did not seek to invoke his speedy trial right because he filed a motion to dismiss. Because dismissal is the only possible remedy for a violation of the right to a

9

speedy trial, the assertion of the right to a speedy trial and a request for a dismissal are not mutually exclusive. *See Dragoo*, 96 S.W.3d at 313. The record establishes Appellant asserted his right to a speedy trial in the trial court on April 10, 2018, by filing a written Motion for Speedy Trial. Appellant's assertion of his speedy trial right in the trial court "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Zamorano v. State*, 84 S.W.3d 643, 651 (Tex. Crim. App. 2002).

Appellant first asserted his right to a speedy trial by requesting a dismissal. Although such an assertion of his speedy trial right ordinarily weakens a speedy trial claim, the record supports an implied finding of historical fact that trial counsel legitimately felt the delay caused so much prejudice that dismissal is warranted, even though the State announced ready to proceed to trial. *See Phillips*, 650 S.W.2d at 401. Appellant was incarcerated on or about April 20, 2014; he was charged with murder on July 23, 2014, and Appellant remained in jail; Appellant was determined incompetent in July 2016; he regained competence in June 2017; new counsel was retained in January 2018; and Appellant first raised his right to a speedy trial on April 10, 2018. The record supports an implied finding of historical fact that Appellant did not deliberately fail to request a speedy trial for tactical reasons. Considering Appellant's assertion of his right to a speedy trial in the trial court, we conclude this factor weighs slightly against the State.

## Prejudice

The last *Barker* factor is "prejudice to the defendant." *Barker*, 407 U.S. at 532–33, 92 S. Ct. at 2193–94. Prejudice is assessed in light of the interests that the speedy trial right is designed to protect. *Id.* These interests are (1) preventing oppressive pretrial incarceration, (2) minimizing the anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired. *Id.* Of these interests, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* Although a defendant has the burden to make some showing of prejudice, actual prejudice is not required. *See Munoz*, 991 S.W.2d at 826. When a defendant makes prima facie showing of prejudice, the state must prove that the accused suffered no serious prejudice beyond that which ensued from the ordinary and inevitable delay. *Id.* Excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove. *See Doggett v. U.S.*, 505 U.S. 647, 655, 112 S. Ct. 2686, 2693, 120 L. Ed. 2d 520 (1992). Yet such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria. *Id.*, 505 U.S.

at 656, 112 S. Ct. at 2693.  But when the state's negligence causes extraordinary delay and when the presumption of prejudice, whether specified or presumed, is neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted by the state, the defendant is entitled to relief.  *Id.*, 505 U.S. at 658, 112 S. Ct. at 2694.

Appellant argues that the approximately seven-month delay related to the DNA results prejudiced him "with continued incarceration."  He does not argue that the prior four years, which included his period of incompetence prejudiced him.

Even so, periods of incompetence are not counted on the speedy trial clock.  *See Love v. State*, 909 S.W.2d 930, 947-48 (Tex. App.—El Paso 1995, pet ref'd) (citing *Dickey v. Florida*, 398 U.S. at 48, 90 S. Ct. at 1574).  Thus, regarding the length of time before trial, we conclude that, under the facts of this case, the five-year delay was not excessive enough to presumptively compromise the reliability of a trial. *See generally Lopez v. State*, No. 12-16-00043-CR, 2016 WL 7488864, at *5 (Tex. App.—Tyler Dec. 30, 2016, no pet.) (mem. op., not designated for publication) (two and one-half year delay not presumptively excessive); *State v. Wray*, No. 05–01–01799–CR, 2002 WL 1763567, at *4 (Tex. App.–Dallas July 31, 2002, pet. ref'd, untimely filed) (not designated for publication) (delay of twenty-five months not presumptively prejudicial even though sufficient to trigger *Barker* analysis) (citing *Sanders v. State*, 978 S.W.2d 597, 605 (Tex. App.–Tyler 1997, pet. ref'd)); *see also Clarke v. State*, 928 S.W.2d 709, 717 (Tex. App.–Fort Worth 1996, pet. ref'd) (concluding no presumptive prejudice in case where delay in bringing appellant to retrial on punishment was two years and five months after U.S. Supreme Court denied certiorari and five months after appellant filed motion for speedy retrial); *but see Dragoo*, 96 S.W.3d at 312 (concluding three-and-one-half-year delay in which appellant played no role is patently excessive).

Furthermore, even after the motion to dismiss was denied, Appellant sought a continuance stating that he had "insufficient time to prepare a defense."  The granting of that continuance allowed Appellant to acquire additional expert reports and testimony, which were used at trial.  As a result, the additional seven-month delay does not appear to have impaired Appellant's defense so as to create prejudice.  This factor weighs against Appellant.

**Balancing the *Barker* Factors**

We now consider and weigh the aforementioned factors.  The reason for the delay, in one instance, is attributable to the State, but only on a "negligence" level.  *See Barker*, 407 U.S. at

531, 925 S. Ct. at 2192.  Moreover, we cannot overlook that the State and Appellant agreed to one of the delays, while several other delays are attributable to Appellant.  From the record, we conclude this factor weighs more heavily against Appellant.  Because Appellant did assert his speedy trial right, and it appears dismissal was not sought for purely tactical reasons, this factor weighs against the State.  Lastly, the prejudice prong weighs in the State's favor because, as previously discussed, the record does not support that Appellant's ability to defend his case was compromised, and Appellant sought to delay the case further after his motion was denied.  Thus, having considered the aforementioned factors and the entirety of the record, we conclude that the factors weigh against Appellant.  *See Barker*, 407 U.S. at 539, 92 S. Ct. at 2182.  Therefore, we hold that Appellant's right to a speedy trial was not violated.  Appellant's third issue is overruled.

**CONFRONTATION CLAUSE**

In his fourth issue, Appellant contends his rights under the Confrontation Clause were violated.  He urges that his right to confront the author of the autopsy report was violated because a different medical examiner testified as to the contents of the report.

## Standard of Review

The Confrontation Clause forbids the admission of testimonial hearsay unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L. Ed. 2d 177 (2004).  Although evidentiary rulings are usually reviewed for an abuse of discretion, the question of a statement's testimonial nature is one of law that is reviewed de novo.  *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

## Applicable Law

The Confrontation Clause of the Sixth Amendment guarantees the accused the right to confront the witnesses against him.  *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 1068, 13 L. Ed. 2d 923 (1965).  "Testimonial" statements are inadmissible at trial unless the witness who made them either takes the stand to be cross examined or is unavailable and the defendant has had a prior opportunity to cross examine the witness.  *Crawford*, 541 U.S. at 54, 124 S. Ct. at 1366.  "Testimonial" statements include those "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for

12

use at a later trial." *Id.* at 52, 124 S. Ct. 1364. Forensic reports prepared in connection with a criminal investigation or prosecution are testimonial and cannot be admitted without satisfying the requirements of the Confrontation Clause. ***Burch v. State***, 401 S.W.3d 634, 636–37 (Tex. Crim. App. 2013).

**Preservation of Error**

The State urges that Appellant failed to adequately object to the surrogate witness's testimony and, as such, failed to preserve his Confrontation Clause argument on appeal.

A defendant's Confrontation Clause complaint is subject to preservation requirements and failure to raise it with the trial court forfeits that complaint on appeal. ***Wright v. Quarterman***, 470 F.3d 581, 586–87 (5th Cir. 2006) (noting that Texas law generally requires defendant to make specific Confrontation Clause objection to preserve such error); ***Davis v. State***, 313 S.W.3d 317, 347 (Tex. Crim. App. 2010) (holding that Confrontation Clause claims are subject to preservation requirements under Texas Rule of Appellate Procedure 33.1(a)(1)(A)); ***Paredes v. State***, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004) (holding that defendant "failed to preserve error on Confrontation Clause grounds" by failing to assert that objection at trial); ***Alford v. State***, 495 S.W.3d 63, 66 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (holding that defendant failed to preserve his complaint that he was denied his right under United States and Texas constitutions to confront and cross-examine complainant).

At trial, the State called Dr. Chester Gwin, a medical examiner from the Southwestern Institute of Forensic Sciences. Dr. Gwin testified that he is the custodian of records and he did not create or author the autopsy report. The authoring medical examiner, Dr. Reade Quinton, was no longer employed by the Southwestern Institute and was unavailable for trial. When the State offered the autopsy report into evidence, Appellant took Dr. Gwin on voir dire. Dr. Gwin stated that he did not conduct the autopsy; however, he had reviewed the autopsy and the photographs. At the conclusion of voir dire, Appellant objected to Dr. Gwin's testimony:

> [Appellant]: Your Honor, I guess I'm going to object to the fact that the witness here is not the party who actually created the report. He hasn't seen the body. He has no knowledge other than looking at the photographs, and we need more than that.
> The Court: Well, let me get this clear. Is your objection regarding his expertise at this point or is your objection that he shouldn't be able to testify --
> [Appellant]: My objection is --
> The Court: -- regarding the autopsy?
> [Appellant]: I think he shouldn't be able to testify regarding the autopsy.
> The Court: Well, he's not yet testified about the autopsy, so I want to -- once -- once those

13

questions are asked, you may make your objection, and I'll also give you a running objection regarding that.

[Appellant]: Thank you, Your Honor.

The Court: But your objection is overruled at this point.

Appellant made no further objections to Dr. Gwin's testimony.

The record reflects that Appellant made a personal knowledge objection and failed to raise a Confrontation Clause complaint with the trial court. Thus, he failed to preserve this complaint for our review. *See* TEX. R. APP. P. 33.1(a); *Davis*, 313 SW.3d at 347; *Paredes*, 129 S.W.3d at 535; *Alford*, 495 S.W.3d at 66. Accordingly, we overrule Appellant's fourth issue.

## DISPOSITION

Having overruled Appellant's first, second, third, and fourth issues, we ***affirm*** the trial court's judgment.

GREG NEELEY
Justice

Opinion delivered April 14, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

14



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

APRIL 14, 2021

NO. 12-19-00268-CR

**CEDRIC DEWAYNE THOMPSON,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 2nd District Court

of Cherokee County, Texas (Tr.Ct.No. 19281)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*